## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Dianne Leighton,                                    Civil No. 10-1701 (PJS/JJG)

                Plaintiff,

v.                                                  REPORT AND RECOMMENDATION

Michael J. Astrue,
Commissioner of Social Security,

                Defendant.
_____

JEANNE J. GRAHAM, United States Magistrate Judge

      Plaintiff Dianne Leighton seeks judicial review of the denial of her applications for Social Security disability insurance benefits and supplemental security income. Specifically, Plaintiff challenges the Commissioner's decision that she did not meet or medically equal Listings 12.04 (affective disorders), 12.05(C) (mental retardation), and 12.06 (anxiety disorders), and that she had the mental residual functional capacity to perform competitive employment. The case was referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and is presently before the Court on cross-motions for summary judgment. For the reasons set forth below, the Court recommends that Plaintiff's motion be granted in part and denied in part, Defendant's motion be denied, the Commissioner's decision reversed, and the case remanded for further administrative proceedings.

## I.    BACKGROUND

      Plaintiff protectively filed her applications for disability insurance benefits and supplemental security income on July 28, 2006, alleging a disability onset date of July 1, 2005. (Admin. R. at 10.) Plaintiff was forty-three years old on the alleged disability onset date. (*Id.* at 20.)

**A.      Medical, Vocational, and Social Services Records**

Although the administrative record contains evidence of mental and physical impairments, Plaintiff's motion for summary judgment is based on her mental impairments. The Court will limit its review accordingly.

In 1977, at the age of fifteen, Plaintiff was admitted to the University of Minnesota psychiatric hospital after threatening to run away from home and displaying suicidal ideation, increased moodiness, irritability, and poor school performance. (Admin. R. at 545.) The evaluating intake physician, Constantine Rigas, chronicled a long history of learning difficulties and poor peer relationships, which had increased in severity over time. (*Id.* at 545-46.) Plaintiff also had a volatile relationship with her mother and sister, and she killed two family pets between the ages of seven and ten. (*Id.* at 545-46.)

During the psychiatric evaluation by Dr. Rigas, Plaintiff cried continuously and could not stay on task. (*Id.* at 549.) Her concentration was poor, and she was easily confused. (*Id.*) Dr. Rigas noted that school testing in 1972 indicated a severe learning disability in reading, which correlated with his test results. (*Id.* at 545, 549.) In 1972, Plaintiff's full scale IQ was 91, verbal IQ was 80, and performance IQ was 104. (*Id.* at 547.) In 1977, Plaintiff's verbal IQ was 75 and performance IQ was 104. (*Id.* at 549.) Dr. Rigas' testing denoted language and language processing difficulties, borderline language skills, and average nonverbal skills. (*Id.*) Plaintiff's reading level was too poor for an MMPI to be administered. (*Id.*) Plaintiff's family was not willing or able to provide a structured and supportive environment, and Dr. Rigas therefore recommended that Plaintiff be sent to a group home pending foster-home placement. (*Id.* at 551.)

Plaintiff's recent medical history begins with two assessments prompted by her social security benefit applications. On September 27, 2006, Plaintiff was evaluated by consultative psychologist Dr. Donald Wiger. (*Id.* at 421.) Plaintiff reported she had dyslexia and trouble with

reading, writing, and remembering, but not with math. (*Id.*) She said she lived in a camper and moved to a different state park every two weeks. (*Id.*) She obtained food once a month from a Washington County food bank. (*Id.* at 422.) She was able to dress and groom herself, but she slept in her clothes and rarely showered. (*Id.*)

Dr. Wiger thought Plaintiff showed a decreased affect and appeared depressed, although Plaintiff said she was happy. (*Id.* at 423.) Dr. Wiger did not find any evidence of a thought disorder, hallucinations, or suicidality. (*Id.*) Plaintiff displayed good memory recall, but her attention, concentration, and fund of knowledge were below average. (*Id.* at 423-424.) Plaintiff scored a verbal IQ of 69, a performance IQ of 84, and a full scale IQ of 74, which was in the borderline range of intellectual functioning. (*Id.* at 424.) Dr. Wiger concluded that Plaintiff could carry out mental tasks consistent with her intellectual functioning, could relate adequately with other people, and could handle the emotional stress of the workplace. (*Id.*)

Dr. Eric Edelman completed a Psychiatric Review Technique Form on November 17, 2006. (*Id.* at 427.) Under Listing 12.04 (affective disorders), he indicated that the medically determinable impairment of depression was present, although it did not precisely satisfy the listing criteria. (*Id.* at 429.) Similarly, for Listing 12.05 (mental retardation), he found that Plaintiff had borderline intellectual functional and learning delays, although again the impairment did not precisely satisfy the listing criteria. (*Id.*) He did not evaluate Listing 12.06 (anxiety disorders) or Listing 12.08 (personality disorders). With respect to the "B" criteria of the listings, Dr. Edelman found Plaintiff's activities of daily living mildly restricted; her ability to maintain social functioning mildly restricted; her ability to maintain concentration, persistence, or pace moderately restricted; and no repeated episodes of decompensation of extended duration. (*Id.* at 432.) In a contemporaneous Mental Residual Functional Capacity Assessment, Dr. Edelman rated most of Plaintiff's abilities as not significantly limited or moderately limited. (*Id.*

at 434-35.) Only her abilities to understand and remember detailed instructions and to carry out detailed instructions were markedly limited. (*Id.* at 434.)

Plaintiff began working with Lorene Leikind, a Department of Rehabilitation Services (DRS) vocational counselor, in February 2007. (*Id.* at 571.) Leikind recommended an evaluation of Plaintiff's learning and emotional abilities to aid in determining her employability, and Plaintiff was subsequently evaluated by licensed psychologist Thomas Richardson. Plaintiff told Richardson that she struggled with reading and writing and estimated her skills at a second-grade level. (*Id.* at 498.) She reported seeing angels and ghosts and said she could sense when people would die. (*Id.* at 498-99.) When Richardson attempted to gauge Plaintiff's depression, she became tearful, emotional, and overwhelmed. (*Id.* at 499.) She described symptoms related to major depression but denied suicidal ideation. (*Id.*) Testing indicated a full scale IQ of 83 and a verbal IQ of 77. (*Id.* at 500.) Plaintiff also demonstrated a mild delay in expressive vocabulary development and significant weaknesses in her general fund of knowledge and practical reasoning skills, but displayed adequate attention, effort, and persistence. (*Id.*) Results of an individual achievement test indicated severe delays in basic reading and writing skills. (*Id.* at 501.)

Overall, Richardson determined that Plaintiff's intellectual functional was in the low average range. (*Id.*) The weakness of her nonverbal scores compared to her verbal reasoning skills were consonant with a language disorder. (*Id.*) Richardson remarked that individuals with similar scores had a very high risk of learning disabilities in reading and writing. (*Id.*) He described Plaintiff as "essentially a nonreader and writer" with reading and spelling skills at a second grade level, incapable of independently completing employment applications. (*Id.* at 502.) With respect to social and emotional functioning, Richardson noted a history of stress due to physical problems, financial issues, and homelessness; a variety of mood-related issues; a

possible history of psychosis; and a potential form of schizotypal personality disorder. (*Id.*) He felt Plaintiff met the criteria for a major depressive episode requiring immediate treatment. (*Id.*) Once Plaintiff's medical and mental health were stabilized, Richardson thought she could benefit from vocational rehabilitation services, but until then, he was concerned that Plaintiff was "not really competitively employable and is best suited for social security support." (*Id.*) He provisionally diagnosed Plaintiff with major depression, moderate to severe with possible psychotic features; a mixed receptive-expressive language disorder, disorder of written expression; a reading disorder; and potentially post-traumatic stress disorder, psychotic disorder-not otherwise specified, and schizotypal personality disorder. (*Id.*)

Plaintiff and Leikind met on March 5, 2007 to review Richardson's assessment, and Plaintiff was receptive to Leikind's suggestion of counseling or therapy. (*Id.* at 570-71.) Plaintiff also told Leikind she had recently interviewed with Walmart for a cashier job. (*Id.* at 570.) When Plaintiff and Leikind met three days later, Plaintiff reported she had been denied Social Security benefits and was concerned about her living and financial situation. (*Id.*) Plaintiff was hired by Walmart a week later as a part-time cashier. (*Id.* at 573.)

Leikind was instrumental in assisting Plaintiff's transition to employment at Walmart. She helped Plaintiff purchase clothes for her uniform, paid for car repairs, and advised Plaintiff how to manage work relationships and conflict with coworkers. (*Id.* at 566-69.) In May 2007, Plaintiff told Leikind she cried at work after an angry customer threw a bag of cat food at her and her manager told her to leave the building. (*Id.* at 569.) Plaintiff asked Leikind to call Walmart and ask if she had been fired. (*Id.*) Leikind did, and a Human Resources representative said Plaintiff's manager had asked her only to leave the floor while he dealt with the customer, and that leaving the building was an automatic basis for termination. (*Id.*) The representative said

Plaintiff could talk to her manager and ask for her job back. (*Id.*) Plaintiff did so and was rehired. (*Id.*)

By June 2007, Plaintiff had completed ninety days of work at Walmart with "significant support" from DRS. (*Id.* at 567.) She passed her employment review with only a few areas of recommended improvement. (*Id.*) Leikind noted, "Although it was originally thought that supported employment would be needed to maintain her job, it was agreed at this time that she will probably not need this service at this time to maintain employment. . . . Case closed, employment outcome achieved." (*Id.* at 568.)

Four months later, however, Plaintiff called Leikind and said she was having problems with one of her managers. (*Id.* at 567.) According to Plaintiff, this manager told Plaintiff she was asking too many questions and that she should not be a cashier because she could not read. (*Id.*) Plaintiff explained to Leikind that she was having trouble reading credit card transactions. (*Id.*) Leikind thought Plaintiff was very anxious and counseled her about how to handle the conflict with the manager. (*Id.* at 567.) Leikind reopened Plaintiff's case and arranged for post-employment services and long-term follow-up through Lifetrack Resources. (*Id.* at 566-67.) A month later, Plaintiff passed her computer training and was eager to start working full-time. (*Id.* at 566.)

But on January 10, 2008, Leikind learned that Plaintiff had been fired. (*Id.* at 565.) Plaintiff said she was fired for taking a used gift card from the cash register to scrape the ice from her car windshield, but Walmart apparently believed she had stolen the gift card. (*Id.* at 557.)

On Thursday, January 31, 2008, Plaintiff met with psychotherapist Alissa Madden. (*Id.* at 556.) Plaintiff told Madden she could not read or write well and that she suffered from depression, anxiety, and post-traumatic stress disorder. (*Id.*) She also described an extensive

history of physical and psychological abuse by her parents, older sister, and boyfriend. (*Id.* at 557.) Madden noted symptoms of a depressed and worried mood, insomnia, decreased appetite, decreased interest in activities, decreased energy, decreased concentration, hopelessness, helplessness, worthlessness, anxiety, and memory impairment. (*Id.* at 558.) She did not observe suicidal ideation, self-injurious behavior, hallucinations, delusions, panic attacks, or phobias. (*Id.*) Plaintiff's Global Assessment of Functioning was assessed at 55. (*Id.* at 558.) Madden recommended a course of individual psychotherapy and a possible psychiatric consultation for medication management. (*Id.* at 559.)

In April 2008, Plaintiff interviewed with Express Personnel with the assistance of a Lifetrack Resources employee. (*Id.* at 561.) The interview did not go well. (*Id.*) Plaintiff arrived an hour early and collected cans in the woods until her appointment time. (*Id.*) She had blood on her face from a dentist's appointment earlier that day, and she asked strange questions and made peculiar comments to the interviewer. (*Id.*) She also took Girl Scout cookies from the interviewer's desk to feed her dogs. (*Id.* at 562.) When Leikind met with Plaintiff to discuss the interview, Plaintiff did not see anything wrong with her conduct. (*Id.* at 560.) Leikind raised concerns about Plaintiff's mental health, and Plaintiff said she had been seeing a therapist but could not recall any details about the appointments. (*Id.*) Plaintiff said her aunt was taking care of all her paperwork and recordkeeping and she would speak with her about signing a medical release. (*Id.*)

After not hearing from Plaintiff for several weeks, Madden called East Metro Adult Crisis Stabilization (EMACS) on June 6, 2008 and requested an in-home assessment and medication evaluation. (*Id.* at 587.) EMACS assists clients in finding mental health services and provides short-term financial assistance. (*Id.* at 586.) Madden thought Plaintiff might have deteriorated to the point where hospitalization would be appropriate. (*Id.* at 587.) After declining

to meet several times, Plaintiff finally met with Thomas Houlton on June 16, 2008. (*Id.* at 584.) Plaintiff said she was not interested in EMACS services because she did not like doctors or medication. (*Id.*)

Meanwhile, Plaintiff began treating with psychiatrist Dr. Karen Ta. Plaintiff told Dr. Ta on November 13, 2008, that she had not been taking her depression and anxiety medication because she could not afford it. (*Id.* at 597.) She complained of forgetfulness but denied anxiety. (*Id.*) Dr. Ta remarked that Plaintiff seemed depressed about some abdominal pain she was experiencing, but found her affect brighter than what Plaintiff described. (*Id.*) Dr. Ta thought Plaintiff's primary problem was her inability to pay for her medication, and she restarted Plaintiff on citalopram. (*Id.*)

Plaintiff returned to Dr. Ta on February 15, 2009 and said she had stopped taking citalopram because it caused constipation. (*Id.* at 595.) Plaintiff reported she could not sleep at night because her brain was "scattered," that she was always tired and forgot to eat, and that she had difficulty concentrating, remembering, and comprehending. (*Id.*) Dr. Ta remarked that Plaintiff was not consistent in reporting her symptoms of depression and confusion. (*Id.*) Dr. Ta described Plaintiff as depressed, worried, sad, and anxious, with fair concentration and memory. (*Id.* at 596.) She diagnosed Plaintiff with moderate, recurrent major depression; an anxiety disorder; a past history of post-traumatic stress disorder; and a schizotypal personality disorder, by history. (*Id.*) Dr. Ta attributed Plaintiff's inability to work to her lack of education and dyslexia, in combination with depression and anxiety. (*Id.*) She prescribed bupropion to treat Plaintiff's depression and improve concentration. (*Id.*)

On March 6, 2009, Dr. Ta completed a diagnostic assessment as part of Plaintiff's rehabilitative mental health services plan. (*Id.* at 590.) She noted a diagnosis of moderate, recurrent major depression; schizotypal personality disorder, by history; and a learning disorder.

(*Id.*) Dr. Ta did not find a significant impairment in functioning. (*Id.*) Approximately two weeks later, in response to a request from Plaintiff's attorney, Dr. Ta suggested that Plaintiff be independently evaluated for disability and learning or cognitive disorders because she did not have enough data to assess Plaintiff's functional capacity. (*Id.* at 605.) She referred Plaintiff to Wiger & Associates, but there is no functional capacity report from Wiger & Associates other than the report completed in September 2006.

Derek Gilde, an adult mental health case manager with Washington County, began working extensively with Plaintiff in 2009. In a letter to the Social Security Administration dated May 8, 2009, Gilde expressed concern over Plaintiff's ability to manage her mental health symptoms, her living and housing situation, and basic needs. (*Id.* at 664.) He commented that Plaintiff's severe learning disabilities prevented her from reading and completing basic paperwork for health and financial assistance. (*Id.*) He described her mood as very low, overwhelmed, and depressed. (*Id.*)

Plaintiff returned to Dr. Ta on April 2, 2009, reporting she was depressed because of her financial situation. (*Id.* at 598.) Dr. Ta agreed that Plaintiff appeared depressed and worried, but she found Plaintiff's concentration and memory fair and her thought process coherent and more organized than usual. (*Id.* at 599.) Because Plaintiff could not afford to buy her prescription medication, Dr. Ta gave her samples of Lexapro.

### B.    Other Evidence of Record

Plaintiff completed a Function Report on August 15, 2006. (Admin. R. at 130-137.) At that time, she lived in a pop-up camper in a campground with two dogs and a cat. On a daily basis, she rested, took her medicine, cared for her pets, and cleaned her camper. She had a car and could drive herself to the store and the doctor's office. A typical meal consisted of opening a can of peas. Plaintiff felt that her physical and mental conditions limited her abilities to lift,

squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, and remember, but not her abilities to complete tasks, concentrate, understand, follow written instructions, and get along with others. She was able to pay bills and handle money but could not read or comprehend written instructions.

Plaintiff's aunt, Shirley Summers, also completed a function report on Plaintiff's behalf. (*Id.* at 177-84.) Among other comments, Summers reported that Plaintiff frequently fought with her boyfriend and that he had been arrested as a result. She wrote that Plaintiff primarily shopped at Goodwill and garage sales and obtained food from a food bank. According to Summers, Plaintiff had been fired several times for her inability to read and follow instructions, and Plaintiff tended to become fearful and cry in response to criticism from supervisors.

### C.    Administrative Proceedings

After Plaintiff's applications were denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge (ALJ). The hearing was held on June 16, 2009. Plaintiff testified that she did not graduate from high school and tried twice unsuccessfully to obtain a GED. (Admin. R. at 25.) She was placed in special education classes in second, seventh, eighth, and ninth grades. (*Id.* at 27.) During her employment at Walmart, she would often cry at work and yell at employees. (*Id.* at 25-26, 28-29.) She required assistance with computer tasks at work. (*Id.* at 28.) She lived in a pop-up camper with no electricity, but she did not want to live elsewhere because of her pets. (*Id.* at 26, 29.) Plaintiff was afraid of doctors and "big people," which made it hard to share her medical symptoms with her healthcare providers. (*Id.* at 31.) Plaintiff claimed she saw seven angels every third month and had premonitions of other people's deaths. (*Id.*) She did not have any hobbies and rarely performed chores. (*Id.* at 30, 32.)

Vocational expert Steven Bosch also testified at the hearing. The ALJ asked Bosch to consider a hypothetical woman in her mid-forties with congenital disc disease of the spine, past

post-cataract and uterine fibroid surgery, past rectal prolapse surgery, history of dyslexia, history of depression, and history of asthma; limited to light work with occasional or no climbing, stooping, or crouching; and further limited to unskilled work, with no rapid or frequent changes in work routine due to reduced stress tolerance. (*Id.* at 35.) Bosch testified that such a person could do light, unskilled custodial work or assemble products at a bench. (*Id.* at 36.) On cross-examination, Plaintiff's attorney asked Bosch to add a history of borderline IQ, schizotypal personality disorder, and inability to tolerate criticism from supervisors or coworkers. (*Id.* at 37.) Bosch testified that such a person could not perform the custodial or assembly jobs previously described. (*Id.*)

The ALJ issued a decision denying benefits on July 19, 2009. As required by 20 C.F.R. § 404.1520(a) and § 416.920(a), the ALJ first considered whether Plaintiff had engaged in substantial gainful activity between her alleged onset date of June 1, 2005 and the date she was last insured, September 30, 2010. (Admin. R. at 12.) He determined that because Plaintiff's employment at Walmart was confined to two finite periods, it could not be the sole reason to deny disability. (*Id.* at 12.)

The ALJ next found that Plaintiff suffered from the severe impairments of degenerative disc disease, history of dyslexia, schizotypal personality disorder, anxiety disorder, major depressive disorder, and borderline intellectual functioning, but that the impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 13.) The ALJ specifically considered Listings 12.04 (affective disorders), 12.05 (mental retardation), 12.06 (anxiety disorders), and 12.08 (personality disorders).

The ALJ then engaged in a comprehensive assessment of Plaintiff's residual functional capacity (RFC). From a physical standpoint, he determined that Plaintiff had the RFC to perform light work, lifting up to twenty pounds occasionally and ten pounds frequently, standing or

walking up to six hours, and sitting up to six hours in an eight-hour workday. (*Id.* at 14.) The ALJ precluded most climbing activities, stooping, kneeling, and crawling. (*Id.*)

With respect to Plaintiff's mental impairments, the ALJ found that she suffered from major depression, although her symptoms were not consistently reported. (*Id.* at 17.) He documented Plaintiff's verbal IQ of 69, performance IQ of 84, and full-scale IQ of 74 with Dr. Wiger; and verbal IQ of 77, performance IQ of 92, and full scale IQ of 83 with Richardson. (*Id.*) The ALJ credited the scores obtained with Richardson over those with Wiger, attributing the lower scores to Plaintiff's awareness that she was being evaluated for disability purposes. (*Id.*) The ALJ gave great weight to Dr. Edelman's opinion, accepting that Plaintiff was mildly limited in activities of daily living, mildly restricted in social functioning, and moderately restricted in maintaining concentration, persistence, and pace. (*Id.*) Other than the intelligence testing, Dr. Wiger's opinion was also accorded great weight, while Richardson's and Gilde's opinions were not given significant weight. (*Id.* at 19.) To accommodate Plaintiff's mental impairments, the ALJ limited her to unskilled work, with no rapid or frequent changes in work routine. (*Id.* at 14.)

Based on the combined mental and physical RFC, the ALJ determined that Plaintiff could not perform any of her past relevant work, but could perform jobs existing in significant numbers in the national economy such as custodian, cleaner, or bench production assembler. (*Id.* at 19-20.) As such, he deemed Plaintiff not disabled.

Plaintiff sought review of the ALJ's decision from the Appeals Council and provided additional evidence of her physical impairments. (*Id.* at 4.) The Appeals Council made the new evidence part of the record, but denied Plaintiff's request for review (*Id.* at 1, 4.) The ALJ's decision therefore became the final decision of the Commissioner.

## II.   STANDARD OF REVIEW

An individual must be disabled to receive Social Security disability benefits. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). "Disability is defined as the inability 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting 42 U.S.C. § 1382c(a)(3)(A)). To determine whether a claimant is disabled at the administrative level, "the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work." *Halverson*, 600 F.3d at 929 (citation omitted); 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a).

On review of a Commissioner's decision denying Social Security benefits, a court examines whether the findings of the ALJ were "supported by substantial evidence in the record as a whole." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (citation omitted). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's decision." *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). When assessing whether this standard is met, a court must consider all evidence, whether it supports  or conflicts with the ALJ's findings. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005). The ALJ's decision should not be reversed, however, merely because some evidence supports another outcome. *Id.* If it is possible to reach conflicting positions from the record, but one of those positions is that of the ALJ, the Commissioner's decision must be affirmed. *Id.*

## III.   DISCUSSION

Before the Court turns to the particular issues raised in the parties' summary judgment motions, one general comment bears mention. This case profoundly illustrates the difficulties of a person with a borderline mental impairment surviving in today's world. Plaintiff did not maintain a medication regimen or regular course of therapy because she could not afford it, yet she was faulted for receiving conservative medical treatment. The pleasant and cooperative demeanor noted by some of her medical providers was not interpreted as a sign of fear, as she testified at the hearing, but used to discount her feelings of anxiety and depression. Her decision to live in a pop-up camper rather than give up her pets was attributed to a lifestyle choice, rather than a possible symptom of mental illness. In examining the findings of the ALJ, this Court has considered all of the relevant evidence, as well as the inferences and implications of that evidence, to determine what constitutes substantial evidence in the record as a whole.

### A.   Mental Retardation, Listing 12.05

Mental retardation is described in Listing 12.05 as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. Plaintiff claims she is impaired under Paragraph C of Listing 12.05, which requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* § 12.05(C) (emphasis added). Combining these definitions, to satisfy the requirements of Listing 12.05(C), Plaintiff must establish the following elements: "(1) deficits in adaptive functioning; (2) evidence of initial manifestation before age 22;[] (3) a valid verbal, performance or full-scale IQ score between 60 and 70; and (4) 'a physical or other mental impairment imposing an additional and significant work-related

limitation of function.'" *Contreras v. Astrue*, Civ. No. 08-1196 (DWF/JJK), 2009 WL 5252828, at *6 (D. Minn. Aug. 26, 2009); *accord Cheatum v. Astrue*, 388 F. App'x 574, 576 (8th Cir. 2010) (unpublished).

### 1.      Deficits in Adaptive Functioning

Deficits in adaptive functioning can be shown through activities of daily living, social functioning, and the ability to sustain concentration, persistence, or pace. *Contreras*, 2009 WL 5252828, at *6; *see also Heller v. Doe*, 509 U.S. 312, 329 (1993) (recognizing, in connection with Kentucky's involuntary commitment procedures for mental retardation, that deficits of adaptive functioning include "the person's effectiveness in areas such as social skills, communication, and daily living skills, and how well the person meets the standards of personal independence and social responsibility expected of his or her age by his or her cultural group") (quoting American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 28-29 (3d rev. ed. 1987)).

Here, the record shows that Plaintiff has long struggled with daily living skills. For much of the period of time under review, she was homeless, living in a pop-up camper in a campground. For years she has relied on the assistance of outside agencies and family members for food, housing, and financial support. With the aid of DRS, Plaintiff was able to obtain a part-time job at Walmart, but she required continuous support during her months of employment. Plaintiff regularly relied on Leikind to help her with computer skills, paperwork, transportation issues, and clothing. Plaintiff's aunt assisted her with recordkeeping and paperwork. A typical meal might be opening a can of peas. Dr. Ta indicated that Plaintiff needed support with obtaining and maintaining financial assistance and housing and with household management skills. Plaintiff's mental health case manager agreed that Plaintiff could not adequately manage

her mental health issues, living and housing situation, and basic needs, nor could she read and complete simple paperwork for health and financial assistance.

Plaintiff's social and communication skills were also deficient, as demonstrated by records from Leikind, Madden, and Dr. Ta. Plaintiff cried and yelled at her Walmart coworkers and was unable to manage interpersonal conflict and criticism. Her inability to understand her manager's instructions initially resulted in her termination until Leikind intervened. Plaintiff's conduct at the Personnel Express interview was bizarre and socially unacceptable. Madden thought Plaintiff had significant difficulties with personal and social functioning, and Dr. Ta remarked that Plaintiff needed support in these areas of functioning.

The ALJ apparently agreed that Plaintiff had deficits in adaptive functioning because he did not specify this factor as a reason to reject her claim of impairment under Listing 12.05(C). The Court concurs that Plaintiff suffered from deficits in adaptive functioning.

### 2.      Onset of Impairment Before Age Twenty-Two

The next question is whether Plaintiff's deficits in adaptive and intellectual functioning were present before age twenty-two. The ALJ did not address this factor at the administrative level, nor does the Commissioner here.

The record evidences a lifetime of learning difficulties. Plaintiff attended special education classes beginning in second grade, did not graduate from high school, and made three unsuccessful attempts to obtain her GED. Early school testing indicated a severe learning disability. Plaintiff also had trouble with social, communication, and daily living skills from an early age. She threatened to run away from home, expressed thoughts of suicide, could not maintain friendships, and killed two pets. During a psychiatric evaluation, she could not stay on task because of continuous crying. Her concentration was poor, and she was easily confused. In

sum, substantial evidence supports a finding that Plaintiff's deficits in adaptive and intellectual functioning began before age twenty-two.

### 3.    IQ

Plaintiff was administered IQ tests on several occasions. When she was ten years old, her full scale IQ was assessed at 91, verbal IQ at 80, and performance IQ at 104. Five years later, she scored a verbal IQ of 75 and performance IQ of 104. With consultative examiner Dr. Wiger in September 2006, Plaintiff scored a verbal IQ of 69, a performance IQ of 84, and a full scale IQ of 74. Testing with Richardson in February 2007 yielded a full scale IQ score of 83 and a verbal IQ score of 77. The only score falling within the requisite range of Listing 12.05(C) is the verbal score of 69 in September 2006. The ALJ rejected this score in favor of the higher score of 77, noting that the February 2007 test results were "significantly higher than [her] scores during her consultative examination when she knew she was being evaluated for disability purposes." (Admin. R. at 17.)

"[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning." *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001). There is no evidence of a change in Plaintiff's level of intellectual functioning between September 2006 and February 2007. The only difference between the tests is that the September 2006 test was administered for the purpose of determining social security benefits. Faced with more than one IQ score, the ALJ had an obligation to accept one as valid and explain why the other was rejected. This was not, as Plaintiff argues, an exercise of lay opinion for expert evidence. This is an instance where some evidence supports one outcome and some evidence another. And in this situation, substantial evidence supporting the ALJ's decision to designate Plaintiff's valid verbal IQ score as 77. Thus, Plaintiff did not meet or medically equal Listing 12.05(C).

### 4.      Another Severe Impairment

Although Plaintiff cannot qualify as disabled under Listing 12.05(C) because she does not have a valid IQ score between 60 and 70, the Court will briefly address the fourth and final factor. The fourth element of Listing 12.05(C) "is met when the claimant has a physical or additional mental impairment that has a 'more than slight or minimal' effect on his ability to perform work." *Sird v. Chater*, 105 F.3d 401, 403 (8th Cir. 1997) (quoting *Cook v. Bowen*, 797 F.2d 687, 690 (8th Cir. 1986)). Besides Plaintiff's borderline intellectual functioning, the ALJ determined she was severely impaired by degenerative disc disease, history of dyslexia, schizotypal personality disorder, anxiety disorder, and major depressive disorder. The ALJ further determined that her degenerative disc disease had more than a slight or minimal effect on her ability to work, because it precluded her from climbing ladders, ropes, and scaffolds, and limited her ability to climb ramps and stairs, stoop, and crouch. Accordingly, the fourth factor of Listing 12.05(C) was met.

### B.      Listings 12.04 and 12.06

The Court now turns to whether substantial evidence supports the ALJ's decision that Plaintiff did not meet or equal Listing 12.04 (affective disorders) or Listing 12.06 (anxiety disorders). According to Listing 12.04, affective disorders are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. For an anxiety disorder falling under Listing 12.06, "anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders." *Id.* § 12.06.

Both Listing 12.04 and Listing 12.06 are subdivided into Parts A, B, and C. Claimants can demonstrate the requisite level of severity by meeting either the requirements of both Parts A and B or the requirements of Part C. *Id.* §§ 12.04, 12.06. The parties here limit their discussion to whether Plaintiff's impairments met the B criteria. That is, Plaintiff's affective disorder or anxiety disorder must have resulted in at least two of the following areas of functioning:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

*Id.* §§ 12.04(B), 12.06(B). "Marked" is defined as "more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C). As the claimant, Plaintiff has the burden to demonstrate that the criteria are met. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004).

### 1.   Activities of Daily Living

Beginning with the first B criterion, "[a]ctivities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1).

The ALJ found that Plaintiff was only mildly restricted in activities of daily living because she independently cleaned and groomed herself, managed her own finances, lived in

substandard housing by choice, cared for her pets, knew how to obtain free meals and showers, and worked part-time for a few months. (Admin. R. at 18.) The Court disagrees with this finding.

As discussed fully in Part III.A.1, Plaintiff was incapable of performing most activities of daily living without assistance. She lived in a pop-up-camper in primitive conditions, moving to a different campground every two weeks, sleeping in her clothes, and rarely showering. She obtained food from Washington County once a month. While Plaintiff owned a car for at least part of the relevant time period, she often relied on Leikind and others to provide transportation alternatives and money for repairs. Plaintiff's aunt took care of her recordkeeping and paperwork. Substantial evidence does not support the ALJ's finding that Plaintiff was only mildly limited in initiating and participating in activities of daily living.

### 2.    Social Functioning

Social functioning encompasses a person's ability "to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2). This area of functioning includes the ability to get along with others, fear of strangers, and instances of altercations, firings, and social isolation. *Id.* On the other hand, cooperative behavior, consideration for others, empathy, and social maturity are favorable considerations. With particular regard to work situations, social functioning "may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers." *Id.*

The ALJ found that Plaintiff had mild difficulties in maintaining social functioning. (Admin. R. at 18.) He took note of her problems getting along with her Walmart coworkers, but thought she generally got along well with others. (*Id.*) The ALJ also remarked that Plaintiff had a boyfriend and that her health providers described her as pleasant and cooperative. (*Id.*)

The record does not support the ALJ's assessment of Plaintiff's social functioning as mildly restricted. Plaintiff's short tenure as a Walmart cashier was marked by altercations with customers and coworkers, and she needed continuous assistance in dealing with those conflicts. She misunderstood her manager when he asked her to leave the floor, which resulted in her termination, and Plaintiff regained her job only with Leikind's assistance. Plaintiff was later fired a second time over a misunderstanding concerning a used gift card. Plaintiff demonstrated bizarre behavior at her Express Personnel interview by collecting cans in the adjacent woods beforehand and demonstrating peculiar behavior during the interview itself. She could not comprehend why this conduct was unacceptable in an employment setting. Plaintiff generally passed her days in social isolation, remaining in or near her camper and interacting with her pets. Although Plaintiff had a boyfriend, their relationship was not healthy and supportive, but abusive. Finally, Plaintiff may have appeared pleasant and cooperative to her medical providers, but she was also afraid to fully discuss her mental symptoms with her providers because she feared them. In sum, the ALJ's assessment of Plaintiff's social functioning is not supported by substantial evidence in the record.

### 3.   Concentration, Persistence, and Pace

"Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3). Limitations in this area are typically manifested in an employment setting and may also be assessed through psychological testing. *Id.*

The ALJ determined that Plaintiff was moderately impaired in maintaining concentration, persistence, and pace, and the Court finds this determination supported by substantial evidence. Plaintiff's employment at Walmart is the best evidence of this criterion. She passed all required

training and was able to complete tasks as required. Leikind never expressed concern about Plaintiff's ability to concentrate on and persevere with a task. Dr. Wiger's testing revealed that Plaintiff's attention and concentration were below average, but not to a marked degree, and he concluded that Plaintiff could carry out mental tasks consistent with borderline intellectual functioning. Dr. Ta described Plaintiff's concentration as fair, and Dr. Edelman assessed Plaintiff as moderately impaired in this area. The ALJ's decision is consistent with substantial evidence of record.

### 4.      Episodes of Decompensation

Plaintiff does not claim she experienced repeated episodes of decompensation, each of extended duration. Thus, the Court will not consider the ALJ's determination that she experienced no such episodes.

### C.      Plaintiff's Mental RFC

Plaintiff argues that the ALJ should have included her inability to respond appropriately to criticism from coworkers and supervisors in his RFC assessment. The ALJ rejected this aspect of social functioning as part of his assessment of the Part B criteria, based on Plaintiff's self-reports to her providers that she had no difficulty interacting with coworkers and supervisors. The ALJ did not discuss the evidence from Leikind or Plaintiff's aunt that corroborated Plaintiff's claimed limitation, and the Court concludes this was an error. An RFC must be based on *all* relevant evidence, including medical records and subjective accounts. *See McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). Here, the record contains evidence from three sources that Plaintiff had difficulty dealing with criticism from supervisors and coworkers. Further, Plaintiff's attorney specifically asked the vocational expert at the hearing whether the inability to tolerate criticism from supervisors or coworkers would preclude the custodial and assembly jobs he described, and the expert replied that it would. The ALJ did not mention this testimony or

explain why he rejected it. Having been put on notice that this claimed limitation was of particular significance, the ALJ erred by failing to consider all of the relevant evidence and testimony and explaining his basis for omitting the limitation from the RFC.

## IV.    RECOMMENDATION

Typically, upon finding that the Commissioner's denial of benefits was improper, a court will remand the case for further administrative proceedings unless the record "overwhelmingly supports" a finding of disability. *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000) (citation and quotation omitted). Having reviewed the entire record, the Court cannot conclude that it overwhelmingly supports a finding of disability and therefore recommends that the case be remanded for further administrative proceedings. On remand, the ALJ should (1) reconsider the extent to which Plaintiff's activities of daily living and social functioning were restricted, as relevant to the Part B criteria of Listings 12.04 and 12.06, and (2) reconsider all of the evidence pertaining to whether Plaintiff could tolerate criticism from supervisors or coworkers in assessing her RFC.

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment (Doc. No. 9) should be **GRANTED IN PART** and **DENIED IN PART** as follows.

   a.    The decision of the ALJ should be reversed.

   b.    Pursuant to sentence four of 42 U.S.C. § 405(g), the matter should be remanded to the Social Security Administration for further proceedings consistent with this Report and Recommendation.

2.    Defendant's Motion for Summary Judgment (Doc. No. 15) should be **DENIED**.

3.      Judgment should be entered accordingly.


Dated: April 5, 2011

                                                         _s/ *Jeanne J. Graham*_____
                                                         JEANNE J. GRAHAM
                                                         United States Magistrate Judge



**NOTICE**

        Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report

and Recommendation by filing and serving specific, written objections by **April 20, 2011**.   A

party may respond to the objections within ten days after service thereof.   Any objections or

responses shall not exceed 3,500 words.   The district judge will make a de novo determination of

those portions of the Report and Recommendation to which objection is made.